STATE OF NEBRASKA v. GEORGE W. McCRIGHT ET AL.; CHARLES S. McDONALD, INTERVENER.*

FILED JUNE 8, 1906.    Nos. 14,210, 14,211, 14,212, 14,213, 14,214, 14,215, 14,216, 14,217.

1. **Indemnity School Lands: RIGHTS OF OCCUPANTS.** By the act of 1875, entitled "An act authorizing parties living on school lands selected in lieu of sections 16 and 36 to purchase the same when the state acquires title" (Comp. St. 1897, ch. 80, art. IV, sec. 4),

* Rehearing denied. See opinion, p. 738, *post.*

persons who complied with the act had a preference right of purchase or lease of land known as indemnity school land, and had title to the improvements made by them thereon.

2. ——: ——. Occupants of indemnity school lands who had complied with the act of 1875 before the repeal thereof were entitled to have the land appraised separately from the improvements, and to be given an opportunity to lease the land upon such appraisement before being ejected therefrom.

3. ——: ESTOPPEL. The fact that the occupant of indemnity school land has attempted to make entry thereof under the homestead laws of the United States, and has, in good faith, contested the right of the state to the same as indemnity school lands, will not estop him to assert his right under the act of 1875 relating to the improvements of actual settlers upon lands so obtained by the state.

ORIGINAL action by the state in the nature of ejectment. *Dismissed.*

*Norris Brown, Attorney General,* and *W. T. Thompson,* for the state.

*Flickinger Brothers* and *H. F. Rose,* for intervener.

*M. F. Harrington, Sanford Parker* and *W. T. Wills, contra.*

SEDGWICK, C. J.

These eight cases were by agreement consolidated and presented together. They involve the right of possession of lands within the abandoned Fort Randall military reservation. The defendants do not claim the title to the lands themselves. In *State v. Tanner,* 73 Neb. 104, which also involved lands within the abandoned reservation, the defendants asserted title in the lands, but that claim was denied. In these cases the right of the defendants to possession of the land is asserted on the ground that they have made valuable improvements thereon, and that the state cannot oust them from the lands without first having their improvements appraised. The origin of the state's title

and rights in the land, as a part of the school lands, is set out at large in the opinion in *State v. Tanner, supra.* The state officials refused to appraise the lands separately from the improvements which these defendants had made thereon; the defendants refused to lease them without such appraisement, and the lands were leased to other persons who have intervened herein and demand possession of the lands under their leases.

In 1893 these defendants settled upon the lands in controversy and began improving them. By the act of July 5, 1884 (23 St. at Large, p.103, ch. 214), congress provided for the surveying, appraisement and sale of the lands constituting the reservation. The act contained no express provisions subjecting these lands to homestead or preemption entry. By the act of August 23, 1894 (28 St. at Large, p. 491, ch. 314), congress provided that all lands of abandoned military reservations placed under the control of the secretary of the interior which had not already been disposed of, and the disposal of which had not been provided for by a subsequent act of congress, should be open for settlement under the public land laws, and the act gave a preference right of entry for six months from the date of the act to *bona fide* settlers who were qualified to enter under the homestead law, had made homes and were residing upon any agricultural lands in said reservation. The state by the enabling act was granted sections 16 and 36 in each township in the state as school lands. Some of these lands so granted, the state for various reasons was unable to obtain. Congress by the act of 1893 (27 St. at Large, p. 555, ch. 200) provided that the state might select lands in this abandoned reservation in lieu of the lands to which it was entitled and which it had failed to receive under the enabling act. In making selection of indemnity lands the state officers, apparently not knowing that the lands in controversy here were occupied by settlers, selected these tracts of land among others. Afterwards, when these settlers applied to the land department of the government to enter these lands under the homestead act pursuant to

the provisions of the act of congress of 1894 above referred to, there was no doubt that they came within the terms of that act, and would have been entitled to so enter the lands, but for the fact that the disposal of these lands had been provided for by the act of congress which allowed the state to take the lands as indemnity lands as above mentioned. It seems to have been a mere chance that the state selected these lands instead of others in the abandoned reservation. But for the unfortunate fact that these lands were selected by the state when others might as well have been selected, the defendants would have been recognizd by the land department of the government, and would have been allowed to take these lands under the homestead law; and so it seems manifest that, although when they went upon the lands they did so without any assurance from the general government that they would or could acquire title to the lands, still the government did not regard them as wrongdoers, but on the other hand enacted legislation which would have protected them and would have given them the lands which they had occupied and improved, but for the accident that the state mistakenly selected these lands instead of other lands equally available which it might have selected. The state seems to have anticipated that such conditions might exist. As early as 1875 the legislature enacted: "Any person or persons who shall have resided continuously for a term of five years on lands selected in lieu of sections sixteen and thirty-six for common school purposes, shall, unless the state acquires title thereto, have the privilege of purchasing the same, on the same terms as other school lands are purchased from the state: *Provided,* That such land shall be appraised under direction of the county commissioners, at not less than seven dollars per acre: *Provided further,* That such appraisal shall not include any improvements placed on said lands by the person so purchasing the same." Laws 1875, p. 123. This law was in force when these defendants went upon the lands in question, and made the most of their improvements thereon, and also when they made their

application to the general government to enter the lands under the homestead law and were denied the right to so enter them because of the fact that the land had been disposed of by the general government by allowing the state to take the land as indemnity school lands. If this statute had remained in force until this action was begun there could be no doubt of the rights of these defendants. Under this statute it would clearly have been the duty of the state to have appraised all of the improvements that the defendants had placed upon these lands separately from the lands themselves before attempting to lease the lands to these defendants or to any other person. No such appraisement was made by the state, and without such appraisement the leases were made under which these interveners claim. The statute in question was repealed by the act of 1899 (laws 1899, ch. 69), and the question is as to the effect of this repeal upon the rights of these defendants. The act of 1897 (laws 1897, ch. 71) repealed prior acts governing the entry and leasing of school lands, and provided general laws governing the educational lands of the state. By section 5 of said act provision is made "for paying for movable improvements" to the person owning the same, and giving to any person having made such movable improvements the option for six months of removing them from the land or accepting the appraised value thereof. Although these provisions are expressed in general terms, and might in the absence of any other legislation upon the subject be construed to apply to the case at bar, yet in view of the act of 1875 above referred to, which was continued in force and must be construed with the new act, this section cannot be applied to these defendants. From the time that this act of 1875 was enacted until its repeal in 1899 the laws governing the educational lands of the state were repeatedly changed, amended, repealed and reenacted. But the legislature at each session recognized this act of 1875. It constitutes a special provision governing the rights of settlers upon government lands that afterwards may become a part

of the school lands of the state by their selection as indemnity lands "in lieu of sections 16 and 36 for common school purposes," and must, of course, govern any general provisions of the statute enacted with it. Section 17 of the act of 1899 provides for the forfeiture of leases for the nonpayment of rent, and contains the only reference in the act to improvements on the school lands in the following words: "Persons owning movable improvements on lands reverting to the state may remove the same within six months after such land is released and all improvements not so removed shall inure to the benefit of the new lessee." This section, of course, could not apply to these defendants. Section 4 provides for the appraisement of school lands and its language is so general as to include the lands in question. Nothing is said in this section in regard to improvements upon the lands. Under the law as it existed at the time this section was adopted, the improvements upon these lands belonged to the settlers thereon who had placed them there; and we think that, rather than to conclude that the legislature intended to confiscate these improvements, the section should be construed to require the state's rights and interest in the land to be appraised, which would not include the improvements made by *bona fide* settlers upon lands that had been selected by the state as "indemnity school lands," which improvements, by the act of 1875, would belong to such settlers. The lands then should have been appraised separately from the improvements, and these settlers should have been given the opportunity to lease the lands upon such appraisement. Without such appraisement and opportunity to the settlers, the state would not be entitled to the possession of the land, and could not make a valid lease thereof to other persons, and this action therefore cannot be maintained. The fact that further legislation may be necessary to enable these settlers to purchase the lands upon such appraisement, or otherwise avail themselves of the value of their improvements, does

not relieve the state officials of the duty to cause the lands to be appraised separately from the improvements as above indicated, and to allow these settlers to lease the lands upon such appraisement.

2. These defendants at first resisted the claims of the state upon the ground that the law had not been complied with by the state, and that for other reasons the state was not entitled to these lands as indemnity school lands. Upon that theory the defendants applied to the land department, as before stated, to enter these lands under the homestead act, but this contention was decided against them both by the general land office and by this court in *State v. Tanner, supra.* It is now insisted that, by making this contention, the defendants have estopped themselves to claim that they are entitled to the improvements which they had made upon the land under the statutes of this state regulating the entry and leasing of school lands, but we do not see any merit in this objection. It does not appear that the right of the state to the lands themselves, as against these defendants, was so clear and free from all doubt as to justify a charge of bad faith against the defendants in attempting to homestead the lands; and, when it was decided that they were not entitled to the land, no good reason appears why they should not be allowed, after it had been established that these lands are a part of the school lands of the state, and came within the provisions of the act of 1875, to ask the state to comply with the provisions of that act.

We conclude that neither the state nor the interveners were entitled to the possession of these lands when this action was begun. The action therefore is dismissed at the cost of the state.

DISMISSED.

The following opinion on motion for new trial and motion for rehearing was filed May 10, 1907. *Motions overruled:*

BY THE COURT.

In 1903 the state claimed that the lands known as the "Boyd County School Lands" belonged to the state, and that the settlers on the various tracts of land that have been in controversy since were trespassers thereon. It then had the lands involved in this suit appraised for leasing under the statute then in force, and these defendants, who were settlers on the land and had been occupying and improving the land for ten years prior to that time, challenged the title of the state and claimed, that they had the right to the lands under the homestead laws of the United States. A suit was begun then against several defendants, situated similarly with the defendants in this case, and upon trial in this court it was determined in March, 1905, that the state owned the lands, and that the settlers must surrender the lands to the state. *State v. Tanner*, 73 Neb. 104. The lands of these defendants, as before stated, were appraised in 1903, and these defendants then refused to lease them from the state because they were making claim to the lands, and did not desire to waive those claims and acknowledge that the lands belonged to the state. Therefore the state at once leased the lands to intervener McDonald and other parties, and the other parties have assigned their leases to McDonald, and he claims under a lease executed in 1903 when the right in the land itself was in controversy. After it had been decided as before stated, in *State v. Tanner, supra*, that the state was entitled to the lands, which decision was in March, 1905, the state began this action in April of that year against these defendants. No new appraisement of the land was made, the state insisting and this intervener insisting, that the appraisement made two years before and the lease made to this intervener and his assignors under that appraisement were valid and binding. These defendants from the time of the appraisement two years before to the time of commencement of this action had been occupying the lands

and making improvements thereon, believing that they were the owners of the land; but when that claim was decided adversely in *State v. Tanner, supra,* and after this action was begun, the defendants conceded that they were not the owners of the land, and made application to the state to have the land appraised. They made this demand as settlers upon the land, claiming that they had then been settlers upon the land for twelve years and making improvements thereon. Under this application some proceedings were had before the county board, but the matter appears to have been referred to the state board, and it adopted a resolution to take no action thereon because the matter was pending in the supreme court. It will be seen that the statement in the opinion that the state refused to appraise the land separately from the improvements is inaccurate because it is not limited. The state, when it demanded the land, had the land appraised separately from the improvements, but after its claim of ownership of the lands was settled in its favor no opportunity was given these defendants to lease the lands. In the former opinion herein it was said:

"When it was decided that they (these defendants) were not entitled to the land, no good reason appears why they should not be allowed, after it had been established that these lands are a part of the school lands of the state, and came within the provisions of the act of 1875, to ask the state to comply with the provisions of that act."

The defendants appear to have acted in good faith throughout, as shown in the former opinion. They presented their case upon the theory that, after their right to the land had been determined adversely, they were entitled to have their improvements appraised, which would include the improvements made during the two years (now four years) since the appraisement. The former opinion was written upon the supposition, mistakenly as it now appears, that the appraisement made in 1903 was not relied upon by either party. If that appraisement is now regarded as sufficient for the purposes of this action,

these defendants will forfeit their improvements because they insisted upon their right to the land itself. It seems more reasonable to hold that the appraisement of 1903 was abandoned on the part of the state by its delay in bringing this action. During that delay the situation of the parties' and the condition of the land were so changed as to require a new appraisement. In this view of the case the judgment is right. The motion for new trial and the motion for rehearing are therefore

OVERRULED.